Robert Haley. May it please the Court, I'm Robert Haley from Randall and Danskin in Spokane, Washington, and I'm representing the Mount St. Helens Mining and Recovery Limited Partnership. And just because this is a cavernous place, do you mind speaking up just a little bit more? Thank you. Certainly. I'd like to reserve five minutes for rebuttal, if I may. There are several issues on which the outcome of this appeal could turn, but there are three issues that I'd like to address today. The first of those is whether or not the Forest Service could properly refuse to offer equivalent mineral interests in exchange for the Limited Partnership's patented mining claims, which were within the monument. The second is whether the Forest Service's offer in January of 2003 was entitled to the deference that is normally accorded to agency decisions. And the third issue is whether the district court erred in granting summary judgment in holding that there were no issues of fact to be determined by a trier of fact. Addressing the first issue, which is a statutory interpretation issue, if we look at Section 3A of the Monument Act, Congress stated, the Secretary shall acquire all lands and interests in lands within the boundaries of the monument by donation, exchange in accordance with the Act, or other provisions of law, or purchase with donated or appropriated funds, except as provided in Subsection C, and accept that the Secretary may acquire mineral and geothermal interests only by exchange. Now the Forest Service has taken the position that it's all right to offer basically scenic properties in exchange for our mineral interests, and that's what they've done. If Congress had intended that as one of the options, then why would not Congress have said that the Forest Service could purchase our mineral interests with appropriated funds or donated monies? Well, but see, that seems to me to be a different question. What I was looking for in the statute is where is the requirement that says mineral for mineral? And I think you raise a really good point. They could have said other things, and they might have said it differently if they were, you know, sitting there with this case. But what I'm looking for is to see whether the service is required to exchange mineral for mineral. Where in the statute do you think it says that? It doesn't specifically say that in the statute. I'm trying to approach this, and I think the only way to approach this is from a common-sense perspective. If it were simply proper for the Forest Service to establish a, quote, fair market value for our mineral interests and then convert those into some other property, then why couldn't the Forest Service have simply paid fair market value? But Congress clearly didn't want it to do that. No, it only wanted it to do it by exchange. So there's sort of three parts here. You know, you've got the fair market value, and then there's how you can do it, and then there's what you do with it or how you get it. But I guess you make a good argument in terms of what might make sense, but how could we go beyond the statute to even get to your argument if the language is clear? Well, I'm trying to think of what could Congress possibly have been trying to accomplish by saying that the Forest Service could exchange our mineral interests for scenic properties. Well, I don't know. We only know that they decided in mineral that you could only do it by exchange. And that's clear, right? You agree with that? Yes, it is. But then you would have to actually add in a little section of the statute to agree with you, wouldn't we, to say, and if you do that, you've got to get mineral for mineral. Correct. But I guess I'm just having trouble. They might have had a lot of things in mind. They might have decided that in these mineral interests, we don't want to be paying out a lot of cash out of the Treasury we want. We've got all this land around the United States, and we're just going to give them something else. Why isn't that just as possible? In other words, because these mineral interests are such variable values, we don't want to risk the impact on the Treasury, for example. I think that there is some indication from the comments of Representative Linda Smith at the passage of the Completion Act that this is the intent of Congress. Clearly, exchanging scenic properties for mineral interests is not exchanging apples for apples. Correct. Clearly, there is a huge difference between a property that has tremendous upside potential and a property that basically has a fixed value. Well, it's interesting because they don't say in the exchange dialogue in the Act similar or like properties. I mean, there have been exchanges, like you said, scenic property for minerals. It may be that that scenic property, if it could be developed, would be a heck of a lot more valuable in the long term to someone who wants to make the exchange than a mineral property, which is difficult to develop. So when the deal is made and the government comes in and makes the offer, it seems to me, as Judge McEwen put her finger in it, how do we determine that once a value has been established that the next two steps must be adhered to, i.e., okay, we've established whatever, in this case, $241,000. It's got to be $241,000 of minerals somewhere else. And so then, in this case, they said, no, it's only cash. So I'm having the same problem as Judge McEwen. I can understand the valuation problem, but then if you're looking at valuation of dissimilar properties or dissimilar minerals, cash seems to be a known quantity, $241,000, $241,000. So I don't know how you – is there any history you can point us to? We haven't been able to find anything. Then we said one statement from Congressman Smith. That's correct. That's correct. And if the history had been, you know, we value the entrepreneurship of miners and we don't want to take away their opportunities that they know best, mining. And so if we're going to take your mining claim away, we're going to give you another one so you can use your expertise. But I don't see that anywhere. It seems to me that that's implicit in what Congress is trying to do, in part because it's so much easier to exchange a mineral deposit for another mineral deposit. Well, you say that, but then, of course, we'd be right back where you are about arguing over the value of it. So maybe they're saying once I fix the value of one of these, that's plenty. I don't want to have to get into it twice. You know? I mean, I guess you could make up all sort of scenarios, all of which lead you to the point that that's not our job to try to figure that out if the language is clear. Because I just didn't see an ambiguity in the statute that would permit me to kind of go down the path you'd like us to examine. Yes, I think the comments of Representative Smith are the only ones that we have. Okay. The only clues that we have. That's fair. That's candid. And now, one of the other issues that I'd like to address is that regarding the deference which was accorded to this particular action by the Forest Service. And this is one that troubles me very much. Normally, first I should start by saying that the Forest Service is not normally the government agency which is responsible for evaluating mineral interests and granting patents. That's the Bureau of Land Management. Therefore, this is not an area of substantive agency expertise which would normally warrant some deference in its decisions. Now, the Forest Service also has a vested interest, in this case, in valuing mineral interests as low as possible because that means that it will give up less in return, whether we're talking about property or we're talking about money. Well, but doesn't that then go to the next step? In this case, if I'm not wrong, there were various experts on both sides relative to valuation. Then the Forest Service appointed an appraiser who then in turn got his own geology expert. And then the appraiser, and I didn't find anything in here other than the fact that you challenged his ability or his qualifications to value minerals. He then evaluated all of them. So then we're down to one issue. Are you saying it all turns on the fact that they chose an appraiser who was not qualified to make a mineral valuation? Is that where your argument would go? That's not exactly what I'm saying, no. Well, because if his qualifications, if the appraiser, whoever it is, is not being challenged on qualifications and if he reviews all the evidence, including independent valuations, where's the problem? Because it's not an agency action other than the fact that the agent would say, gee, I don't like what you've done. Is their action accepting that person the wrong action? Is that it? Is that where they're arbitrary and capricious? Is that it? No, where they're arbitrary and capricious is saying that this is the only value and saying this is a take-it-or-leave-it offer. We were in the middle of litigation. Take-it-or-leave-it, I don't know, what does that have to do with the law? I mean, is it something, the fact that the government can't give you an offer, it's got to keep it open forever and got to give you more and more offers? What's take-it-or-leave-it mean? I don't understand it. Okay. My point is that the government is taking the position that that's its only obligation and that it's totally satisfied its obligation once it presents an offer, once it hires an appraiser. Okay. But even the regulations that the Forest Service cites in its brief talks about additional appraisals, talks about submitting things to arbitration, talks about further steps, whereas the government, which was facing a trial date, decided to do something basically to cut off the ability to have judgment by an impartial third person, which would be the judge. And instead, they asked the judge to give the Forest Service deference to, by using the arbitrary and capricious standard, they changed this motion from a normal Rule 56 motion where questions of fact would be determined by a trier of fact to basically a hands-off approach where the judge was forced to. I picked that up in your briefing, too, and this is what confused me. Are you saying, and maybe you can help me understand it, are you saying that somehow the agency's got to do something more akin to litigation of appraisals, i.e. not one appraisal where, in this case, he took all the evidence before him and made an appraisal, and that that appraisal has to be litigated? And so how do we get there to get away from that arbitrary and capricious act that they, that arbitrary or capricious act that they may or may not have done? So how do we get there? Well, in the first place, the appraiser didn't take into consideration the opinions of our experts. Basically, the appraiser rejected the opinions of our experts. A trial judge would not necessarily have done that if we had been permitted to present these opinions at trial. We had identified these experts as expert witnesses for the purpose of trial. The government had not identified this appraiser as an expert witness for the purpose of trial. And as I pointed out in our brief. When you file, it's kind of one of these things where they pull the rug out from under you. The question is, is that fair under the procedures? Because they basically sat on this thing since Mount St. Helens blew up and took you to file the suit to, like, wake these people up back there or down there. So then they woke up and they said, oh, we're going to put a valuation on this thing. So I guess the question is, in the district court, you originally wanted the district court to light a fire under them, right? Isn't that basically what you asked? That was one of the things we wanted to do. And we wanted a declaration. And that worked. I guess filing a lawsuit got them to make the valuation, right? That was one of the things. Okay. And then what else were you asking? And we asked for a declaration that the government had unlawfully withheld action. Okay. And even if that were true, then the only thing the district court could have done is to lit another fire and say get on to it, right? They would have given us declaratory relief. At what point we would have been a prevailing party on that issue. But you see, since the Forest Service went in, I mean, they went in and they made this final determination on the valuation, correct? Yes. So that's really what we're now looking at. I mean, I guess procedurally I'm having trouble figuring out why you would be entitled to a trial on the valuation. Even under the regulation cited by the government, 36 CFR 254, even under that regulation, there is a provision for a third-party determination in case of a dispute regarding valuation. And so we already had a procedure for third-party determination that was already in effect, which was the trial court action. But that's not what they're saying in that regulation. Well, it didn't limit it. It's not like you can just say we have a dispute, therefore we're going to go to the district court to resolve it. I mean, that regulation is talking about an administrative procedure for resolution of a dispute. It doesn't say you can invoke an Article III judge to come over and solve the dispute. It does provide for arbitration, Your Honor, which is a third party outside the agency. Right. But that's not the federal district court, correct? And I believe it says or other processes. So it does have a catch-all as well. Right. It's pretty clear that the government in this case did drag its feet. It's pretty clear that the government in this case knew that it was facing judgment day very soon. And if you look at the whole way in which this appraisal came down, look at the timing of it. You look at the amount of time between the issuance of the appraisal report and the motion for summary judgment. All of this shows more of a trial tactic than a reasoned agency decision. And for that reason, it should not be entitled to the presumption of regularity that a normal agency decision, a normal agency process is entitled to. Is there any precedent that would guide us on that issue? I understand your argument. They horsed you out for years. You sued them. Shortly before trial, you get this offer. We shouldn't give it the normal deference. Is there any precedent that supports that? Your Honor, I cannot point to an appellate decision which has directly addressed this point. It's almost like in a way you're trying to say, well, it's unfair that they can just sit on it and then parachute in here like nothing happened. Yes. So what's the consequence? In other words, isn't there some penalty, or at least in your view, if not a penalty, putting you on equal footing in terms of no deference is what you're asking? And there are at least Supreme Court cases that say that when the government does delay, that the issue should not be considered moot by the trial court, because there's the potential for repetition. There's a potential for having this happen again. Of course, it can't happen again here. We only have one piece of property, right? As to this piece of property, no. But of course, that's the limit. If you were offered to give you an offer, then you would have, would you have had a right to attorney's fees as a prevailing party? I believe we would, actually. I believe if we had proceeded to trial, we would have prevailed on the issue of unreasonable delay, and we would have been a prevailing party on that issue and we would have been entitled to attorney's fees on that issue. What statute would you be getting? Is that, is there an attorney's fee provision in that monument statute? No. No. This would be just the general statute. Well, I'm not sure which general statute. Is it the equal access to justice statute or what other? There's no general statute that, unfortunately, you know, that gives prevailing parties the right. It has to be a specific statute. You can think about that. Why don't, I don't want to waste your rebuttal time. So why, do you want to save some time for rebuttal? I would like to reserve some time for rebuttal. All right. You may do so. May it please the Court. My name is Peter Wynn. Before you get fired up, let me see if I can recast this a little bit. We went down one road, but as I read the briefs, we did not explore something that I read in the briefs. There's two issues here, unpatented and patented mining claims. And they intersected in this delay issue because there were some allegations that the unpatented mining claim negotiations were being bargained off in an attempt to deal with the patented mining claims, et cetera, until there was a settlement in the lawsuit on the unpatents, which resulted in a donation, tax, blah, blah, blah. So now, maybe you don't have to address that directly, but somewhere along the line, I think that has to be factored in when we talked about this delay and whether the government should have or the district should have jumped into this and whether there was one appraiser. Do you know where I'm going? I think so, Your Honor. Okay. Maybe you know better than I do, but anyway. Well, let me just go ahead and write in and address that question. This case was originally filed in the district court as a mandamus case, as well as an inverse condemnation case. The inverse condemnation case is no longer before us. It was dismissed and it's not been appealed. Now, had the unpatented mining claim case been decided at that point and settled? No, that had not. It was still ongoing at the same time? Yes. Anyway, the inverse condemnation case, that was dismissed without prejudice, right? That's correct. But is there a statute of limitations issue? I mean, should it have been transferred under the transfer statute? Should the court have transferred it to the court of claims? Because if what Mount St. Helens Mining, in part, is saying is because you made this a monument, we couldn't get access to develop our property, you know, maybe they have an inverse condemnation claim. Well, I haven't actually focused on the statute of limitations question, and it wasn't presented. We argued in the district court, and the district court rejected our statute of limitations argument. Right. But the transfer statute would have provided, I think, if I've got it right, that if that claim could have been brought in the court of claims, then the court should transfer it if it's in the interest of justice. I think that would be possible. It may still be possible to do. The plaintiffs did not request that it be transferred, and it was not transferred. That would be my question, is that is there a sui sponte responsibility on the court to transfer it when the parties are proceeding along the pleadings, and the advocate here, the plaintiff, didn't ask for any transfer, and everybody knows where it belongs, I mean, that claim. Well, there was a dispute about that, Your Honor. The plaintiff was insisting that it did belong in the district court until the very end. Be that as it may. They thought it should be in the district court. It turns out they're wrong, and the district court says, you know, I can't handle this. I don't have jurisdiction. Your $6 billion claim is more than $10,000. Shouldn't the district court transfer the claim? Well, the plaintiff's argument was, well, the answer is I don't know. Is that issue before us in any way? No, it's not. It's not. It hasn't been appealed by the appellants, and it's certainly no longer before this court. It may still be alive, and they can file it in the Court of Federal Claims if they wish, and that issue could be determined there now. As to the equal – What about attorney's fees? I don't know if the Equal Access to Justice Act applies in this setting, but, you know, normally it applies if the government takes a position that's substantially unjustified. Right. So what if it's substantially unjustified for the government to wait so long to make an offer, and then there's a suit to compel it to make its offer, and then shortly before trial it makes the offer? Can the plaintiff get attorney's fees then? Again, that issue is not for this Court because the plaintiff has to be a prevailing party to get attorney's fees. As to the delay claim, and I would like to address that because it was the first question I got, and I'm sort of trying to answer it, so apologies. You can work it in. I don't care. I wanted to follow up on that attorney's fees question. I just looked again. I was kind of startled when we started talking about attorney's fees because I didn't see it anywhere. It's not before us, and it wasn't decided below because they weren't the prevailing party. They didn't ask the district court for that relief. They were not the prevailing party, and they haven't preserved it on appeal. As to the question of the agency's unreasonable delay, which was what the plaintiffs argued in the district court. There was an extreme delay. In fact, it took two acts to get this going. We had the first act, the Monument Act, and then there was the second act, and it was only until after the second act that things started to move, and then the lawsuit moved it along. Well, yes and no. I mean, it's been a long delay. That's no question. It's 22 years now that the statute's been passed. Which part of the answer is no? The no part of the answer. The no part of the answer is basically what the district court said when the district court reviewed their claim under 706-1 of the Administrative Procedure Act, the mandamus provisions of that act, and determined that it was not, as he said, solely the agency's fault that there had been a delay. That's why I raised the question, because thrown into that argument then was this unpatented mining claim dispute, the lawsuit, the settlement, and all that stuff. And I couldn't figure out how that all tied together if that excuses the delay relative to patent claims. What the district court found and what the record shows is that the – a lot of the took place – actually started almost immediately after the passage of the Monument Act in 1982. That precipitated litigation in 1985, and the principal focus of that litigation were these unpatented mining claims. That was settled a year later through a fairly – with an idea that the unpatented claims would be donated, the plaintiff would get a tax deduction, everybody would be Unfortunately, the IRS had different ideas about what the value of that deduction was, and so that continued to drag on. The Forest Service – It was on evaluation. It was on evaluation of the – With the IRS. It had nothing to do with the parties. That's right. Well, that was the point of contention. That was the point of contention in the district court. The Forest Service contended that they didn't want to get involved in the IRS's business. And the plaintiff came in to say, hey, you need to do a valuation for the IRS. And we said, hey, the lawsuit's over. And the district court said, not only is the lawsuit over and you've settled it and you're out of that issue of the unpatented claims, you guys own them now. So then he found that the – he looked at the question, well, heck, you guys here at the Forest Service, why didn't you make an offer to buy the patented claims that you've always wanted to buy and everybody agrees you've got to buy or try to acquire through a land exchange? I keep saying buy. And the district court looked at the record, and the court has this record. And the record shows that the plaintiff refused to engage in negotiations with Forest Service over the status of these patented claims, the ones we all agree we want, until the status of the unpatented claims was resolved. But that was – now, I read through that to say that was the leverage. In other words, being the act doesn't affect unpatented claims. Until they could get some leverage through the patented claims, they weren't getting anywhere on the unpatented claims. So that's basically the situation. And that – the district court found that that was at least one of the principal reasons for the delay. So what happened after the district court dismissed the claims as to the unpatented claims is that the Forest Service started actively trying to get an appraisal in place, trying to get expert geologists to evaluate the property. And, of course, the problem is it has to be an apples-to-apples comparison with respect to the appraisal of the mineral interest. To do that, you have to figure out what you've got in the first place, and you need all these geologists to look at it. Did the geology work in the appraisal process start before they filed their action for declaratory relief? It did not. It was started when the – So in spite of all the other stuff, the unpatented lawsuit – the unpatented claim lawsuit – Actually, I stand corrected on that point. There was – there was actually a fair amount of geological work done by both the In 19 – I think the record shows that 95 was the EMSOL appraisal. I can check that against the record. And the record also shows the agencies' geologists had started to do the geological analysis prior to 99, or when the lawsuit was filed. I hope that's answering your questions that you started with. Again, what we are dealing with in this case, I think, as the questions from this repellent's argument, is an appeal where the district court has granted summary judgment on the administrative record after applying standard arbitrating capricious test under the Administrative Procedure Act. Now, it is critical to point out that Congress directed in the Monument Act that this process takes place through a consensual land exchange. The – the Forest Service applied its regulations in determining the appropriate valuation to set for purposes of the land exchange, and the district court reviewed that valuation decision and found that it wasn't arbitrary and capricious. Is there any precedent on the issue whether the long, long delay would change the view of the agency's action? I think there is no precedent to suggest that it would. And, in fact, the existing precedent that I'm aware of, although it hasn't been specifically briefed, indicates that the remedy of the plaintiff would be an action, as they filed here under 706.1, to go ahead and hurry up and do what they were supposed to do under the statute. So is there no other remedy for someone in this situation other than to light the fire through if the district court had had to issue an order for the service to take action? In other words, there's no remedy, you're saying, for the fact that they had to wait so long? Well, I think the remedy would come into 706. If the court, for instance, in this case, had found, based on the record, the district court, that is, that the agency had unreasonably delayed in violation of the standard under 706.1, we'd be in a different posture here. Obviously, then, the plaintiffs might have submitted a claim for attorney's fees, and we would have argued about that. Here, however, the district court found that it wasn't just the agency's fault, that the plaintiffs, in fact, had been taking an unreasonable negotiating position, and the district court said that that was the reason for the delay. That issue is no longer on appeal, but even if it were, it would be reviewed based on an abuse of discretion standard, not a de novo standard, which is where we are now, although what we're reviewing, of course, is the agency's decision. Let me ask you a different one. This is one where the timing of the valuation is the fair market value back then. No. It's current. The valuation under the regulations and, I'm sorry. Is it current market valuation? It's the value as of evaluation of the property, as of the time of the acquisition by the government. In other words, you set it at or near the time when the government is actually going to get the property. Here, there's no condemnation. The plaintiffs continue to own their property. They have the right to use and enjoy it. And so the government hasn't acquired it. And the valuation determination under the regulations is set at or near the time of the proposed acquisition by the government, which would be roughly the current date. Is there any evidence in the record that from the date Mount St. Helens blew up to the date of acquisition that there had been a decrease in value of minerals, not because of Mount St. Helens, but general market, so that your delay caused them a loss? In other words, Mount St. Helens is one element. But outside of the record, the world market in minerals changes. Right. I understand. And whatever in the United States mining has gone away. So what's in the record relative to that? Because was delay argued in the valuation process? And I know that they wanted an earlier date for valuation. We're sort of stuck under the rules, of course, with the current valuation. The record doesn't show ñ I mean, obviously, nobody's done an appraisal of the property as of 1982. Whether we could even do that sort of a question, which, you know, I've asked appraisers and they have no idea how you get the comps back then. But assuming you went back there and looked at it, the plaintiffs have made the argument that you ought to set the price as of 1982. And other than the fact that it's contrary to the regulations governing the land appraisal process, what you're doing as you set the price way back then is effectively giving the owners a put. In other words, if the price goes up, they're never going to sell to the government. If the price goes down, then they'll sell to the government because it'll be lower than the market. So it doesn't really make any sense from a practical point of view. But let's look at the record in terms of whether there's been any diminution in value. The only thing in the record, and the record is really basically silent on this point. It wasn't argued in the district court. And that is the price of copper. And the price of copper basically determines what these things really go for. The price of copper, if you look at the John Simmons report, which I guess is behind CR80C1, C2 is actually a study of the price of copper over a year, over a various period of time. And it looks, if you compare that with the Hambacher analysis, the price of copper was more or less the same in 1982 as it was when the Hambacher analysis came down in 2002. If we were to actually renew the offer, we'd have to renew the appraisal, actually the price of copper has doubled in the last two years. So presumably the appraisal would have to be adjusted upward to reflect that fact. But basically what you're doing is you're figuring out what these things are sold for in the open market. You adjust that for the commodity price of copper. And then you basically make sure that the regulation provides either regulation or statute that says that when you exchange it has to be for fair market value at a current market. Those regulations are attached at the appendix to the brief. And the definition of, I think, appraisal includes fair market value. There's a reference to the uniform standards of federal land appraisals, which also has a very clear statement about fair market value. And, of course, those are quoted in the record by the agency in their response to some of the complaints by the plaintiff. So there's substantial evidence in the record as well as in the law that it has to be fair market value and it has to be current fair market value. As opposed to timber, which has a particular case had a value at the time or a year after. That's right. And Congress condemned the timber because what it didn't want was the Forest Service companies going in there to harvest the timber when it would all knock down and we all wanted to leave it there. So apart from the timber, Congress did not provide for a condemnation authority here and basically recognized that we might not be able to acquire this consensually. And in that event, Congress said, well, you can mine it according to federal and state law. And that's pretty much where we are. We're in a state where they still have their property. We would like to acquire it, but they don't want to buy it. They don't want to sell it to us at our price. Does the record say anything about to what extent the government moved more quickly on acquiring other interests in Mount Sinai? Yeah. Is there any kind of aggregate? Sorry, you mean other landowners, other middle interest owners? Yeah, there's no aggregate data in the record. I don't want to know anything about the record. There's no data in the record of how we've treated other people. There is record about the Burlington Northern Warehouse acquisition, which took place in the Completion Act, of course, and that's about a 400. Congress told us to pay through credits more or less the same price that we're actually offering here. And when did that take place? I can't remember the dates of that compared to this acquisition. The Warehouse Burlington Northern, that took place just after the Completion Act, I think about a year, which would have been 1999. 1999, and then the offer in this case was made? 2002. 2000? 2002. 2002. These companies have a way of sometimes getting the government's attention, but like regular people, I mean, does the record tell us other people similarly situated to Mount St. Helens got this kind of long delay? The record doesn't show that. We independently know that there's been a lot of land acquisitions and mineral interest acquisitions from the monument area. Here's my concern. But we don't have that record. 7 or 6-1, someone could ask a court to compel an agency action unreasonably withheld, right? Okay. So that's a feasible remedy. Compel agency to act. What do you do if the agency generally doesn't act and they get sued under Part 1 and then right before the date of a trial, then they act? Well, first of all, we're not there in this case. The record shows that the delay was not the fault of the government. But assuming that we had an agency behaving like a horse's ass and just didn't want to do it and didn't care, I think that you'd have a 7 or 6-1 remedy, and that would be all the law would provide for. Now, in this case, however, the Forest Service wants to fire this stuff. It's limited by the statute and by the regulations about what it can pay for it. So there's certainly plenty of willingness on the Forest Service's part to get this stuff because they want a clear title to the monument. And they have, in fact, acquired substantial amounts of property out at the monument area over the course of a period of 20 years or so. This stuff takes a long time, by the way, as you can look in the record. It takes a long time to prepare geological opinions, a long time to do the appraisals of them. It's slow. But apart from the fact that it takes about three years to do a land exchange where everybody's working together and not fighting, the fact is the Forest Service wants to acquire this stuff, would still be willing to acquire this stuff, has offered to pay cash through tripartite exchanges to get this stuff. The problem is basically valuation. The plaintiffs just are not happy with what the Forest Service is legally obligated to pay. Thank you. Thank you. You have about one and a half minutes left. Thank you, Your Honor. With all due respect, the record does not show that the government was not the fault of the delay in this case. In fact, the record shows the contrary. We pointed out from the clerk's record from the memorandum of law that was filed by the government, it's CR 26. The memorandum of law that was filed by the government in 1985, in that memorandum, the government basically pooh-poohed the congressional direction that the exchanges take place within one year, pointing out that it's in the sense of Congress and it's not mandatory. The government also stated in that same memorandum that the act provides that the secretary may acquire minimal claims if he wishes. And the government was not just talking about unpatented claims because as to unpatented claims, the government took the position in the 1985 litigation that the government had no obligation whatsoever to acquire the unpatented claims. The evidence in the form of the testimony of Mr. Spears, the testimony of Mr. Minium, both of which were submitted in the form of affidavits, and the government's own actions in its memorandum, in addition to its delay in waiting to hire an appraiser until August of 2002, which was in the record. It was in the record of the reviewing officer's report. All of those things created, certainly at the very least, an issue of fact with respect to the government's unreasonable delay, an issue of fact as to which the plaintiffs had an ability and a right to trial. Thank you. The case of Mount St. Helens v. The United States is submitted. I thank you for your argument, and we're adjourned for the morning. All rise.
judges: Brunetti, McKeown, Gould